## In re LUCKENBACH S. S. CO., Inc.

## THE FREDERICK LUCKENBACH.

(District Court, S. D. New York. December 15, 1925.)

1. Seamen ⬤⟫29(5)—Evidence held to show that injury to seaman was due to defective condition of winch.

Evidence *held* to show that injury to seaman, sustained when draft being lowered into vessel crashed through hatchway covering, was due to defective condition of winch, and not to negligent operation thereof, making vessel liable.

2. Seamen ⬤⟫29(4)—Seaman did not assume risk of defective winch, with operation of which he was not concerned.

Seaman did not assume risk of defective winch, with operation of which he had nothing to do.

3. Seamen ⬤⟫29(5)—Evidence held to show that seaman injured by fall of draft was not negligent.

Evidence *held* to show that seaman, injured by fall of draft caused by defective winch, was not negligent, so as preclude recovery.

4. Damages ⬤⟫132(7)—Twenty-one year old seaman held entitled to $20,000 damages for compound fractures of both legs and other permanent injuries affecting his mental horizon.

Where draft being lowered into vessel broke away and struck 21 year old seaman, causing compound fractures of both legs and other serious injuries, requiring numerous operations, and 3½ years' hospital treatment, making him permanent cripple and affecting his mental horizon, *held,* that seaman was entitled to $20,000 damages.

In Admiralty. In the matter of the petition of the Luckenbach Steamship Company, Inc., for limitation of liability, as owner of

the steamship Frederick Luckenbach, against the claim of Harvey H. Kimmel for compensation for personal injuries. Decree for claimant.

Decree affirmed in 16 F.(2d) 171.

Carter & Phillips, of New York City (Peter S. Carter, of New York City, of counsel), for petitioner.

Harry S. Austin and Russell H. Robbins, both of New York City, for claimant.

KNOX, District Judge. At the time of the accident in which the injuries, for which Harvey H. Kimmel now asks compensation, were received, he was a young man of 21 years. Just prior to becoming a seaman upon the steamship Frederick Luckenbach, on May 20, 1921, claimant had been honorably discharged from the United States Navy, in which he had served for four years. Without doubt he was then well and strong, and enjoyed the prospect of a long and healthful life.

The Frederick Luckenbach left Philadelphia for Rotterdam upon May 21, 1921, carrying a cargo made up largely of wheat. At least, such grain filled No. 1 hold beneath the main deck hatch coaming to the 'tween deck. Upon arrival at destination, the wheat was discharged by means of suction pipes, and there was no occasion to use the winch at No. 1 hatch between the date of the vessel's departure from Philadelphia, and June 16, when cargo for the return voyage was in process of being loaded at the Dutch port.

On the morning of the last-mentioned date, Kimmel, in company with another seaman, was ordered into the lower portion of No. 1 hold for the purpose of preparing the bilges for inspection. While thus occupied, the hatchway into the hold beneath the 'tween deck was closed, and the loading of cargo into the intermediate space was begun. This was unknown to Kimmel and his shipmate. At about 10 o'clock a. m., the third officer of the ship ordered claimant to report on deck to the chief officer. The only means of leaving the hold was by way of a ladder which led to a manhole in the 'tween deck, nearby the hatchway. In obedience to the command received from the third officer, claimant began the ascent of the ladder. He had about reached the manhole opening onto the 'tween deck when a draft of cargo, consisting of two barrels of aniline dyes and weighing something over 500 kilos, and which had been swung over the square of the main deck hatch, carried away and crashed through the hatchway covering on the 'tween deck.

Kimmel was struck by some of the falling material and hurled to the bottom of hold No. 1, sustaining compound fractures of both legs, as well as other hurts of a serious nature. He was taken to a hospital in Rotterdam, where he remained a patient for about 5 months. Through no efforts of the owners of the Frederick Luckenbach (indeed, they seem to have abandoned him), claimant was removed to the Marine Hospital in Staten Island in November, 1921. At this institution he remained for three years, undergoing one operation after another. With the aid of leg braces and a cane he is now able to walk about with more or less uncertainty of movement. His legs are emaciated; one of his feet is turned unnaturally, and his general movements are like unto those of a man upon whom rests the weight of years and the weakness of early decrepitude.

Not only are these physical manifestations of the result of the accident to be observed, but it is also apparent that Kimmel has become somewhat of a neurasthenic. Pain, suffering, and physical weakness have left a plain imprint upon his mental horizon. While he is at present employed at clerical work in the office of a relative, and receives wages of $20 per week, there is no doubt that claimant's injuries are permanent, and that he will be a lifelong cripple. Under such circumstances, the damages which he should be awarded, in the event that petitioner is held at fault, should greatly exceed the sum of $2,000, suggested by its proctors. In fact, if liability be found to exist, I should consider an award of damages in the sum thus suggested as an aggravation of the grievous injuries he has sustained.

[1] The unseaworthiness, upon which liability is sought to be imposed upon petitioner, grows out of alleged defects in the winch with which cargo was being loaded into No. 1 hatch. It was installed on the steamer in 1919, and was then secondhand; it was also of a different type from the nine other winches with which the vessel was equipped. These latter were operated by steam, both when lowering and raising cargo; whereas the alleged defective machine was of single friction type and lowered cargo only by gravity. Control of the load was regulated by means of a foot brake, through which a circumferential band, fitted with wooden blocks, might be pressed against the drum, about which the fall ropes were wound.

In ordinary practice, the winch in question operated somewhat as follows: When steam was turned into it, a friction clutch, by means of a hand lever, would be caused to engage with the drum. This clutch was

held into engagement with recesses within the drum by springs positioned on the sides of the moving shaft. Upon such engagement, the load to be raised would be lifted by steam power. But, once the load was to be lowered away, the steam would be turned off, and the friction clutch disengaged. Reliance for a safe descent was placed upon the operativeness of the foot brake and the skill and care of the winchman.

So far as is revealed by the interrogatories addressed to that workman, he was competent to perform the work, having been engaged in the stevedoring business for 29 years. His version of the accident is to the effect that when the draft of cargo, which was carried away, had been swung over the square of the hatch, he put his foot on the foot brake to the hold the load. He then disengaged the friction from the steam power, and released, to some extent, the pressure upon the brake, expecting the draft to begin its descent. It remained stationary. Again the winchman sought to release the load, by easing up on the brake. There was no result. Once more he endeavored to accomplish his purpose, and upon this occasion the draft carried away into the hold, with the disastrous consequences already mentioned.

That the winchman accurately described the occurrence is not disputed by petitioner. Its contention is that the operator was careless in his attempts to release the foot brake, and, further, that the winch had been duly inspected and was in good order and condition. The defense would have considerable appeal, were it not that another one of the stevedoring crew claims to have examined the winch immediately after the accident and found "that the brake was not strong enough to hold a heavy load." Another winchman, who was working a machine close by the one that is said to have been defective, declares that it was not working properly prior to the accident. In addition, there is testimony that the winch, aside from being used to remove Kimmel from the hold, was not thereafter employed in the loading of cargo at Rotterdam.

While the matter of the subsequent use of the machine is in sharp dispute, I am unable to find that the winch was in perfect working order from the mere fact that it served to raise claimant from the ship's hold. As has been shown, the winch, in raising loads, was operated by steam power, and in such operation the brake band played no important part. In other words, the winch might easily be in working order so far as lifting loads was concerned, and be defective in lowering them. Undoubtedly the winches were inspected with more or less regularity, but it does not appear that the one in question had been examined with any particularity of attention to the wearing surfaces within the brake band. And it does not appear that, aside from oiling, and some observation as to how the winch operated from time to time, there was any critical examination of its working parts. An affidavit, made by the third officer of the steamer, and which was offered in evidence[*] as being in contradiction of the testimony given by him upon the stand, says that he believes that "sometimes it had to be pressed down until it touched the deck before it would take hold, because the weight of the casks seemed to cause a crackling sound on the fall as they were being lowered, and that was because of the strain due to the heavy draft, calling for an extra amount of exertion on the foot brake."

If this be true, it is not difficult to find that the winch's appurtenances were defective. When the pedal, by which the brake was operated, came in contact with the deck, the amount of power that could be applied to the brake had reached its limit. Assuming that the brake would hold while in that position, it is reasonable to conclude that, as the brake was released, the power of gravity in the fall would quickly overcome the holding power of the brake. In other words, there was no fair margin of safety between the point at which the brake was supporting the draft and that at which it could not be made to do so. What happened here seems to me to be nothing more or less than the result reasonably to be expected from the use, too long continued, of a worn brake band.

Petitioner argues that the winchman, when he saw that the brake would not hold, should have thrown in the friction, and thus stopped or retarded the descent of the draft. This may or may not be true, dependent upon the swiftness with which the draft fell. The testimony would indicate that there was little time for resort to any such procedure.

The master of the Luckenbach, who did not see the accident, testifies that the winchman subsequently admitted to him that, as he saw what was happening, he "got excited." That he did so is not improbable; but, even so, the fact will not excuse petitioner. The excitement, which may have prevented the winchman from doing all that might have been done to avert the accident, was created by an event that was the natural outcome of petitioner's failure to have the winch in proper working condition. That failure was the proximate cause of plaintiff's injury.

[2, 3] As for petitioner's argument that

Kimmel met with misfortune, due to one of the risks of his employment, little need be said. He did not assume the risk of defective machinery with which he had nothing to do. Nor was he negligent in responding to the command of his superior when he was summoned to come on deck. Kimmel had no knowledge of what was going on in the 'tween deck. When he went into the lower hold, cargo was not being loaded. Although it is true that the cover had been placed over the hatchway between the lower hold and the 'tween deck, there is nothing to show that claimant was aware that there was any likelihood of danger to him as a result. Being aware of no good reason for declining to obey the command given him, he had no alternative than to obey. He sought to do so by the only means available to him, and, in the course of the effort, met with injuries directly attributable to petitioner's negligence.

[4] It follows that he should recover. From what has already been said concerning claimant's injury, it is apparent that the recovery should be substantial. In my estimation, the amount of the award should be $20,000, and it will be fixed at that figure.